**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 25-CR-10233-AK |
| LUIS FELIPE CHAVARRIA-LOPEZ, | ) ) ) | |
| Defendant. | ) ) | |

**MEMORANDUM AND ORDER ON LUIS FELIPE CHAVARRIA-LOPEZ'S**
**MOTION TO DIMISS THE INDICTMENT**
**BASED ON DUE PROCESS VIOLATIONS**

**ANGEL KELLEY, D.J.**

On June 5, 2025, Mr. Luis Felipe Chavarria-Lopez was charged by Indictment with one count of Unlawful Reentry of a Deported Person pursuant to 8 U.S.C. § 1326(a). [Dkt. 1]. On December 11, 2025, Mr. Chavarria-Lopez filed a Motion to Dismiss the Indictment based on Due Process Violations during the deportation proceeding on which the charge relied. [Dkt. 59]. The government opposed. [Dkt. 74]. On January 31, 2026, Mr. Chavarria-Lopez replied to the government's Opposition [Dkt. 76] and the government filed a Sur-Reply on February 6, 2026. [Dkt. 80]. On February 9, 2026, this Court held a Motion Hearing on the pending Motion. [Dkt. 81]. For the following reasons, Mr. Chavarria-Lopez's Motion to Dismiss the Indictment based on Due Process Violations is **GRANTED.**

**I.     BACKGROUND**

The Court will provide a brief recitation of the facts necessary to resolve the instant Motion.

1

### A.  Mr. Chavarria-Lopez's History

Mr. Chavarria-Lopez, a Guatemalan national, first entered the United States on September 16, 2013, in Texas.  Five days later, Mr. Chavarria-Lopez was ordered removed via an expedited removal administrative proceeding, purportedly conducted by Border Patrol Agent Edward W. Mort.  About a month later, Mr. Chavarria-Lopez reentered the country and was again apprehended.  After his prior order of removal was reinstated, he was removed from the country for a second time.

Some time in April of 2014, Mr. Chavarria reentered the country and he has lived continuously in Massachusetts since.  Mr. Chavarria-Lopez works for a landscaping company and has been filing taxes since receiving an ITIN number from the Internal Revenue Service in 2020.

### B.  Expedited Removal Proceedings Under 8 U.S.C. § 1225

8 U.S.C. § 1225, in certain circumstances, allows immigration officers to determine if an undocumented person is inadmissible and enter a removal order, generally without any type of hearing or review.  Specifically, immigration officers can initiate expedited removal proceedings against those undocumented people *arriving* in the United States, during which, as relevant here, the officer must determine if the arriving person does not possess a valid entry document. 8 U.S.C. §§ 1225(a)(3), (b)(1)(A)(i); 1182(a)(7)(A)(i).  "Unless an alien professes a fear of persecution or claims to be a lawful permanent resident (LPR), an expedited removal order 'is not subject to administrative appeal.' However, the Attorney General has the discretion to provide a type of statutory relief to certain aliens: withdrawal of application for admission. When an individual is permitted to 'withdraw' his application for admission, he may leave voluntarily and without a removal order, and thus without facing formal immigration consequences." United

States v. Raya-Vaca, 771 F.3d 1195, 1200 (9th Cir. 2014) (citations omitted).

The Department of Homeland Security has codified specific regulations regarding the procedure used during an expedited removal. Specifically, "[t]he regulations governing expedited removal proceedings codify, in mandatory terms, the immigration officer's duty to inform the alien of the charge against him and to allow the alien to review the sworn statement prepared in his name." Id. at 1204. According to the regulations,

> An alien who is arriving in the United States . . . who is determined to be inadmissible . . . shall be ordered removed from the United States in accordance with section 235(b)(1) of the Act. In every case in which the expedited removal provisions will be applied and before removing an alien from the United States pursuant to this section, the examining immigration officer shall create a record of the facts of the case and statements made by the alien. This shall be accomplished by means of a sworn statement using Form I–867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act. The examining immigration officer shall read (or have read) to the alien all information contained on Form I–867A. Following questioning and recording of the alien's statement regarding identity, alienage, and inadmissibility, the examining immigration officer shall record the alien's response to the questions contained on Form I–867B, and have the alien read (or have read to him or her) the statement, and the alien shall sign and initial each page of the statement and each correction. The examining immigration officer shall advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement. After obtaining supervisory concurrence in accordance with paragraph (b)(7) of this section, the examining immigration official shall serve the alien with Form I–860 and the alien shall sign the reverse of the form acknowledging receipt. Interpretative assistance shall be used if necessary to communicate with the alien.

8 C.F.R. § 235.3(b)(2)(i). In addition to requiring the name of the officer before whom the proceeding occurred, the officer must identify the language used for the proceeding and if the services of an interpreter were used. Additionally, the Form I-867 reads as follows:

> I am an officer of the United States Department of Homeland Security. I am authorized to administer the immigration laws and to take sworn statements. I want to take your sworn statement regarding your application for admission to the United States. Before I take your statement, I also want to explain your rights, and the purposes and consequences of this interview.

3

You do not appear to be admissible or to have the required legal papers authorizing your admission to the United States. This may result in your being denied admission and immediately returned to your home country without a hearing. If a decision is made to refuse your admission into the United States, you may be immediately removed from this country, and if so, you may be barred from reentry for a period of 5 years or longer.

This may be your only opportunity the present information to me and the Department of Homeland Security to make a decision. It is very important that you tell me the truth. If you lie or give misinformation, you may be subject to criminal or civil penalties, or barred from receiving immigration benefits or relief now or in the future.

Except as I explain to you, you are not entitled to a hearing or review.

U.S. law provides protection to certain persons who face persecution, harm or torture upon return to their home country. If you fear or have a concern about being removed from the United States or about being sent home, you should tell me so during this interview because you may not have another chance. You will have the opportunity to speak privately and confidentially to another officer about your fear or concern. That officer will determine if you should remain in the United States and not be removed because of that fear.

Until a decision is reached in your case, you will remain in the custody of the Department of Homeland Security.

Any statement you make may be used against you in this or any subsequent administrative proceeding.

[Dkt. 60-1 at 7]. The sworn statement captures a series of questions from the administering officer, with answers recorded immediately after. The form is then signed by the undocumented person and the administering officer, with the officer attesting that the statement was "[s]worn and subscribed to before" them. [Id. at 10].

### C. Mr. Chavarria-Lopez's Expedited Removal

An initial review of the I-867 from Mr. Chavarria-Lopez's 2013 expedited removal seemingly shows a standard and proper exercise of authority by Border Patrol Agent Edward W. Mort ("BPA Mort") at the Kingsville, Texas, Border Patrol Station. [Id. at 7]. BPA Mort indicated the proceeding was conducted in Spanish with no interpreter, and the Form was signed

4

on each page by Mr. Chavarria-Lopez, with BPA Mort signing the last page.  However, during the course of this litigation, it has become clear that many of the statements and representations made in the I-867 are untrue and, in fact, no one can confirm what happened other than Mr. Chavarria-Lopez.

According to the government, "[i]n preparing this Opposition the government has learned that an immigration officer other than the officer who signed the forms conducted the expedited removal process with the defendant by videoconference and that the officer who signed the forms was not present." [Dkt. 74 n.2].  Instead, BPA Mort was somewhere else in the facility.  In its Sur-Reply, the government states that "the defendant's A-file indicates a Border Patrol agent in El Paso conducted the proceeding with the defendant by videoconference." [Dkt. 80 at 5]. That indication in the A-file was only signed by BPA Mort, who otherwise fabricated his knowledge of the proceeding.

At the Motion Hearing, the government stated that the expedited removal was conducted by Border Patrol Agent Martin Ortiz ("BPA Ortiz").  Of note, BPA Mort remembers little else other than that he was not in the room during this video conference.  Meanwhile, the government has not been able to find or speak with BPA Ortiz.  In fact, at a prior status conference, the government stated, "they've been trying to identify and locate [BPA Ortiz]. And there certainly are people with that name in the agency at this time but none of them turn out to be the same person."  Of further concern, the government stated, "I actually haven't represented that Ortiz spoke to him in Spanish. I think that's probably what happened, but I don't know that because we haven't spoken to – we haven't been able to find Ortiz."

Despite the clear misrepresentations in the Forms, the government argues the Court should assume that proper procedure was followed and the Form I-867 was completed

accurately, as *someone* needed to speak to Mr. Chavarria-Lopez to populate the Form with the accurate answers that were provided.  Conversely, Mr. Chavarria-Lopez does not ask the Court to make an assumption.  Instead, he provided an affidavit stating

> While detained I was spoken to in English and given documents written in English to sign. I understood that the officers who had me in custody were going to send me back to Guatemala and wanted me to sign the documents, so I signed where I was told to sign. I did not know what I signed because I could not read English. No one translated what was written in the documents to Spanish so I did not understand what was written in the documents. I was not told that I could have a lawyer help me. I was not told that by entering the United States I was technically applying to be admitted and that I could withdraw that application for admission. I did not know what removal proceedings were and did not know that I was being removed from the United States pursuant to formal removal proceedings.

[Dkt. 60-3 at 2].  The government either does not have or has not provided any information to dispute Mr. Chavarria-Lopez's affidavit.

## II.    LEGAL STANDARD

As stated by the parties, Mr. Chavarria-Lopez is charged by indictment with one count of unlawful reentry of an undocumented person, in violation of 8 U.S.C. § 1326(a). [Dkt. 1].  An undocumented person violates Section 1326(a) if he:

> (1) has been denied admission, excluded, deported, or removed or has departed the United States while an order of exclusion, deportation, or removal is outstanding, and thereafter
>
> (2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously denied admission and removed, unless such alien shall establish that he was not required to obtain such advance consent under this chapter or any prior Act[.]

8 U.S.C. § 1326(a).  Mr. Chavarria-Lopez challenges his prosecution under 8 U.S.C. § 1326(d), which codified the Supreme Court's decision in United States v. Mendoza-Lopez, which allows

6

the accused to challenge the validity of their underlying deportation. 481 U.S. 828, 837-38, 841

(1987) ("Depriving an alien of the right to have the disposition in a deportation hearing reviewed

in a judicial forum requires, at a minimum, that review be made available in any subsequent

proceeding in which the result of the deportation proceeding is used to establish an element of a

criminal offense.").  In brief, "[u]nder Mendoza-Lopez, 'a person who is prosecuted for illegal

reentry based on a previous order of deportation must have meaningful review of the validity of

his or her deportation order.'" United States v. Ferreira, No. 17-CR-10267-IT, 2019 WL 418845,

at *7 (D. Mass. Feb. 1, 2019) (quoting United States v. Luna, 436 F.3d 312, 317 (1st Cir. 2006)).

To successfully attack the underlying deportation upon which the felony charge relies,

the accused must demonstrate that:

(1) the alien exhausted any administrative remedies that may have been available
to seek relief against the order;

(2) the deportation proceedings at which the order was issued improperly
deprived the alien of the opportunity for judicial review; and

(3) the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d).  "The elements of section 1326(d) are conjunctive, and [a defendant] must

satisfy all of those elements in order to prevail on a collateral challenge of his removal order."

United States v. Soto-Mateo, 799 F.3d 117, 120 (1st Cir. 2015).

## III.   DISCUSSION

### A.   Exhaustion of Administrative Remedies and Deprivation of the Opportunity for Judicial Review

As stated in the government's Opposition, "[t]he defendant's expedited removal was

conducted pursuant to 8 U.S.C. § 1225(b)(1)(A)(i), a statute that precludes both administrative

and judicial review. Courts have thus concluded that a defendant seeking to attack a removal

order issued pursuant to the expedited removal statute automatically satisfies the first and second

prongs of § 1326(d)." [Dkt. 74 at 6-7 (citing Ferreira, 2019 WL 418845, at *7-8; Raya-Vaca, 771 F.3d at 1202; United States v. Barajas Alvarado, 655 F.3d 1077, 1082 (9th Cir. 2011)]. As a result, the only element in dispute is if the entry of the 2013 expedited removal order was fundamentally unfair.

### B.    Fundamental Unfairness

To establish fundamental unfairness, "courts uniformly require a showing of procedural error and prejudice." Luna, 436 F.3d at 319.

### 1.    Procedural Error

"[I]n United States v. Loaisiga, the First Circuit 'assume[d] without deciding that it would be a fundamental flaw under Mendoza-Lopez to fail to advise one threatened with deportation of his statutory right to self-obtained counsel,' noting that in immigration matters, 'it has been left primarily to Congress and to INS regulations to dictate the course of proceedings.' . . . Without further guidance from the First Circuit, the [C]ourt proceeds first by determining whether the procedures here violated those mandated by Congress and INS regulations." Ferreira, 2019 WL 418845, at *8 (quoting United States v. Loaisiga,104 F.3d 484, 486 (1st Cir. 1997)).

As stated above, the regulation requires the examining immigration officer to create, via a sworn statement, a record of the facts and statements made by the person subject to removal. 8 C.F.R. § 235.3(b)(2)(i). This sworn statement must be captured using Form I-867AB, Record of Sworn Statement in Proceedings under Section 235(b)(1) of the Act, and "must record statement[s] regarding identity, alienage, and inadmissibility." Id. The immigration officer must read or have read to the accused all of the information on the Form I-867A, which includes who the officer is, the rights of the accused, and the purposes and consequences of the interview. Id.;

[Dkt. 60-1 at 7]. The Form also informs the accused that they are applying for admission and do not appear to be admissible, and if they are refused admission, they may be barred from reentry for a period of five years or longer. [Dkt. 60-1 at 7]. Finally, the immigration officer must also "advise the alien of the charges against him or her on Form I–860, Notice and Order of Expedited Removal, and the alien shall be given an opportunity to respond to those charges in the sworn statement. After obtaining supervisory concurrence . . . , the examining immigration official shall serve the alien with Form I–860 and the alien shall sign the reverse of the form acknowledging receipt." 8 C.F.R. § 235.3(b)(2)(i). Importantly, "[i]nterpretative assistance shall be used if necessary to communicate with the alien." Id.

Put plainly, the Court finds not only that the regulation was not followed but that it was entirely ignored and discarded. The government asks the Court to believe that an unknown agent they cannot find, BPA Ortiz, complied with the regulation, reading the admonitions included in the Forms I-860 and I-867 and accurately recording Mr. Chavarria-Lopez's responses. The only evidence this occurred are the statements and signature of BPA Mort, who misrepresented that he conducted the expedited removal proceeding in Spanish, making such claims when he was not even in the room. The government concedes that BPA Mort was elsewhere in the building when BPA Ortiz was allegedly conducting the removal process in Spanish—one of the only things that BPA Mort remembers. Of note, however, the government cannot even confirm that BPA Ortiz conducted the proceeding in Spanish, if it occurred. As the government stated at the Motion Hearing, "I actually haven't represented that Ortiz spoke to him in Spanish. I think that's probably what happened, but I don't know that because we haven't spoken to – we haven't been able to find Ortiz."

The Court finds little reason to credit all or any part of the government's assertions in

9

light of the identified falsities and inconsistencies.  Conversely, Mr. Chavarria-Lopez provided a sworn affidavit stating that he does not speak English, that he was only spoken to and given documents written in English that were never translated, and that the officer made clear he would be sent back to Guatemala. [Dkt. 60-3 at 2].  He was not told that he could have the support of a lawyer, that he was applying for admission, or that he was in removal proceedings. [Id.].

In light of this evidence, the Court does not only find that error occurred, but that whatever occurred during Mr. Chavarria-Lopez's 2013 removal dispensed with the regulation altogether.  This is entirely sufficient procedural error to satisfy the first prong of fundamental unfairness.

### 2. Prejudice

Turning to prejudice, "[t]he standard . . . in this context is 'a reasonable likelihood that the result would have been different if the error in the deportation proceeding had not occurred.'" Luna, 436 F.3d at 321 (quoting Loaisiga, 104 F.3d at 487).  While the parties disagree about the importance of the causal nexus between the procedural error and prejudice to satisfy the Luna standard, the Court finds it unnecessary to resolve this dispute, as there is a causal nexus between the procedural errors and the prejudice here.

The government attempts to cabin the prejudice analysis to the agents' failure to inform Mr. Chavarria-Lopez of his ability to apply for discretionary relief, which courts have found is not a procedural error. [Dkts. 74 at 8-11; 80 at 2-5 (citing Ferreira, 2019 WL 418845; Soto-Mateo, 799 F.3d at 123)].  Thus, as the argument goes, any prejudice that resulted from failing to apply for discretionary relief cannot be tied to sufficient procedural error; however, that ignores the nature of the procedural error here—namely, the complete disregard for the regulation and the subsequent false attestations to the following of proper procedure.  This was not simply a

10

failure to inform of discretionary relief.  Instead, Mr. Chavarria-Lopez was not told of the charges against him or given an opportunity to respond.  He was not even aware that he was applying for admission or that there would be consequences from being found inadmissible based on his application.  Instead, he was made to believe that deportation was a foregone conclusion and that there were not otherwise any rights or remedies.  He believed that the decision was already made and there were no other options.  Had Mr. Chavarria-Lopez been aware of the charges against him and his opportunity to respond in his native language, or had he been aware that he was applying for admission and the consequence of being found inadmissible was that he could not return to the United States for five years or more, it is reasonable to believe he would have asked for alternatives to applying for admission, including withdrawal of his application for removal.  To argue that the failure to follow the regulation in its entirety would not result in such prejudice would render the regulation entirely superfluous.

At base, if the government disregards its own regulation during removal proceedings, failing to provide the most basic guardrails to ensure the accuracy of the forms it uses to record expedited removals, the Court must consider the obvious consequences to the accused's right to notice, to respond, and to request relief.  To find otherwise would mean agents could summarily remove those attempting to enter the country without any process at all—agents could ask the questions and provide the answers without anyone or anything stopping them.  When, as here, agents then take steps to hide the lack of proper process, the fundamental unfairness is compounded.

In light of the above, the Court finds that the prejudice—Mr. Chavarria-Lopez's lack of understanding of the charges against him, his right to respond, and his ability to avoid a formal finding of inadmissibility—was the result of the procedural errors—the disregard of INS's own

regulations and the subsequent obfuscation of their failure to follow the regulation. Accordingly, the Court must consider if there was a reasonable likelihood that Mr. Chavarria-Lopez would have been successful in his request for withdrawal of his application for admission.

### 3.    Withdrawal of Removal

As stated by Mr. Chavarria-Lopez, "[i]n determining whether withdrawal was plausible in Raya-Vaca, the Ninth Circuit looked to the INS Inspector's Field Manual, which instructs officers to 'consider all facts and circumstances related to the case to determine whether permitting withdrawal would be in the best interest of justice.'" [Dkt. 60 at 12 (citing Raya-Vaca, 771 F.3d at 1207)]. The Manual enumerates six non-exhaustive factors that officers should consider: "(1) the seriousness of the immigration violation; (2) previous findings of inadmissibility; (3) intent on the part of the applicant to violate the law; (4) ability to easily overcome the grounds of inadmissibility; (5) age or poor health of the applicant; and (6) other humanitarian or public interest considerations." Barajas-Alvarado, 655 F.3d at 1090 (citing INS Inspector's Field Manual § 17.2(a) (2001)). "[A]n expedited removal order should ordinarily be issued, rather than permitting withdrawal, in situations where there is obvious, deliberate fraud on the part of the applicant." Id.

A review of these factors, and other considerations, supports a reasonable belief that Mr. Chavarria-Lopez's application for withdrawal would have been granted. First, Mr. Chavarria-Lopez did not commit any obvious or deliberate fraud. While he entered the country illegally, he did not use any false documents or otherwise make any false statements. He also did not use violent means. Second, at the time of Mr. Chavarria-Lopez's expedited removal, he did not have any prior formal removal orders. Third, while it is true that Mr. Chavarria-Lopez intended to violate the law by entering the country illegally, he did not otherwise intend to violate the law—

his stated intention was to enter the country to find work, not to commit illegal acts such as the sale of illicit goods or fraud. See United States v. Vieira-Ferel, No. 17-CR-00427-JO, 2019 WL 3558169, at *5 (D. Or. Aug. 5, 2019). As to the fourth and fifth factors, it is not clear that Mr. Chavarria-Lopez could easily overcome the grounds for admissibility and his relative youth and good health do not counsel the granting of his application. Finally, the record is relatively underdeveloped as to other humanitarian or public interest considerations at the time of Mr. Chavarria-Lopez's expedited removal. Thus, a review of the enumerated factors leaves some weighing in favor of granting Mr. Chavarria-Lopez's application and some weighing against.

With that said, other non-enumerated factors considered by other courts as part of their review of "all facts and circumstances related to the case" strongly support a reasonable belief that Mr. Chavarria-Lopez's application would have been granted had the procedural errors not occurred. Mr. Chavarria-Lopez had no criminal history at the time of his removal, let alone the "fairly minimal" criminal history considered in other cases in which withdrawal was found plausible. See, e.g., Raya-Vaca, 771 F.3d at 1209; United States v. Grande, 623 Fed. Appx. 858, 861 (9th Cir. 2015); United States v. Ruiz, No. 14-CR-00466-MMM, 2015 WL 13573882, at *6-8 (C.D. Cal. July 2, 2015). Further, Mr. Chavarria-Lopez has identified several other individuals who were granted withdrawal despite a plethora of additional negative considerations. [Dkt. 60 at 15-17]. Finally, known statistics also weigh in favor of a reasonable likelihood that the request to withdraw his application for admission would have been granted. See Raya-Vaca, 771 F.3d at 1209 ("In fiscal year 2004, approximately 70 percent of the individuals subject to expedited removal proceedings were allowed to withdraw their applications. The percentage dropped thereafter, but even in fiscal year 2008 (after which DHS stopped publishing the data) fully 44 percent of aliens subject to expedited removal proceedings were afforded this

13

relief. . . . [T]he data provide relevant context for the frequency with which withdrawal was permitted and, when considered in conjunction with other individualized evidence supporting the plausibility of relief, cuts in Raya–Vaca's favor."); Ruiz, 2015 WL 13573882, at *4 (same); United States v. Gonzales-Lopez, No. 18-CR-00213, 2020 WL 5210923, at *7 (N.D. Cal. Sept. 1, 2020) (same).

On a final note, the government claims that testimony in another case that withdrawal is only granted to those from a bordering country is unpersuasive.  No such evidence has been presented here and subsequent policies, including the removal of non-Mexican nationals to Mexico and other countries of which they are not citizens, cut against the veracity of this claim. Additionally, an appeal to 8 C.F.R. § 1235.4, which states that "[p]ermission to withdraw an application for admission should not normally be granted unless the alien intends and is able to depart the United States immediately," is similarly unavailing.  In this case, Mr. Chavarria-Lopez was removed to Guatemala within days, establishing his intent and ability to depart with immediacy.

In light of both the enumerated and unenumerated factors, including statistics that show that a significant portion of the applications for withdrawal during expedited removal proceedings were granted at that time, it is reasonably likely that withdrawal of Mr. Chavarria-Lopez's application would have been allowed had the procedural errors described above not occurred.  Consequently, there was both procedural error and prejudice, meaning the removal order was fundamentally unfair.

Taken together, Mr. Chavarria-Lopez has successfully demonstrated: (1) he exhausted any administrative remedies that may have been available to seek relief against the order; (2) the deportation proceedings at which the order was issued improperly deprived him of the

14

opportunity for judicial review; and, (3) the entry of the order was fundamentally unfair. Mr. Chavarria-Lopez has successfully challenged his removal order under 8 U.S.C. § 1326(d) and the indictment must be dismissed.

###    C.    Mr. Chavarria-Lopez's October 2013 Reinstatement Order

On a final note, Mr. Chavarria-Lopez's October 2013 removal is a reinstatement of his September 2013 expedited removal, pursuant to INA § 241(a)(5). "'Reinstatement orders do not exist independent and separate from their prior orders of removal but are instead explicitly premised on the prior order.' Accordingly, 'a successful collateral attack on a removal order precludes reliance on a reinstatement of that same order in criminal proceedings for illegal reentry.'" United States v. Barbosa, 368 F. Supp. 3d 172, 177 (D. Mass. 2019) (first quoting United States v. Charleswell, 456 F.3d 347, 352 (3d Cir. 2006); then quoting United States v. Arias-Ordonez, 597 F.3d 972, 982 (9th Cir. 2010)).

Here, Mr. Chavarria-Lopez's successful challenge to his September 2013 expedited removal precludes reliance on the October 2013 reinstatement of his removal.

## IV.    CONCLUSION

Mr. Chavarria-Lopez has successfully challenged his September 2013 removal order under 8 U.S.C. § 1326(d). That removal cannot serve as the predicate for his conviction under 8 U.S.C. § 1326(a). For the foregoing reasons, Mr. Chavarria-Lopez's Motion to Dismiss the Indictment based on Due Process Violations [Dkt. 59] is **GRANTED**. At Mr. Chavarria-Lopez's request, the Court will stay entry of this Order for two weeks to allow Mr. Chavarria-Lopez to communicate with immigration counsel.

In light of this Order, Mr. Chavarria-Lopez's Motion to Dismiss based on the Statute of Limitations [Dkt. 17] and Third Motion to Dismiss based on the Appointments Clause [Dkt. 63]

are **DENIED AS MOOT**.  Similarly, the government's Motions in Limine to Preclude

Introduction of Tax Documents [Dkt. 48] and to Preclude Evidence or Argument Designed to

Elicit Jury Nullification [Dkt. 49] are **DENIED AS MOOT**.

      **SO ORDERED.**

Dated: March 13, 2026                                    /s/ Angel Kelley
                                                        Hon. Angel Kelley
                                                        United States District Judge